## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| ROBERT WOODS and HOLLY JOHNSON, on behalf of themselves and all others similarly situated, | ) ) ) ) |
| Plaintiffs, | ) Case No. ) |
| vs. | ) ) Hon. |
| MIDLAND COUNTY, GLADWIN COUNTY, FOUR LAKES TASK FORCE, a non-profit corporation acting as agent and delegated authority of the Counties, FOUR LAKES OPERATIONS COMPANY, INC., a Michigan for-profit corporation, BOYCE HYDRO, LLC, a Michigan limited liability company, BOYCE HYDRO POWER, LLC, a Michigan limited liability company, BOYCE MICHIGAN, LLC, a Michigan limited liability company, EDENVILLE HYDRO PROPERTY, LLC, a domestic limited liability company, LEE W. MUELLER, an individual citizen of Nevada, DANA NESSEL, in her official capacity as Attorney General and her individual capacity, AG DOES 1–10, in their individual capacities, THE MICHIGAN DEPARTMENT OF ENVIRONMENT, GREAT LAKES & ENERGY, in its official capacity, EGLE DOES 11–20, in their individual capacities,  THE MICHIGAN DEPARTMENT OF NATURAL RESOURCES, in its official capacity, and MDNR DOES 21–30, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) **) CLASS ACTION COMPLAINT** ) **) DEMAND FOR JURY TRIAL** ) ) ) ) ) ) |
| Defendants. | ) ) |

---

**LIDDLE & DUBIN, P.C.**
STEVEN D. LIDDLE (P45110)
DAVID R. DUBIN (P52521)
MATTHEW Z. ROBB (P81665)
*Attorneys for Plaintiffs*
975 E. Jefferson Ave.

1

Detroit, Michigan 48207
(313) 392-0015
SLiddle@LDClassAction.com
DDubin@LDClassAction.com
MRobb@LDClassAction.com

**CLASS ACTION COMPLAINT AND JURY DEMAND**

Plaintiffs Robert Woods and Holly Johnson (collectively, "***Plaintiffs***"), individually and on behalf of all others similarly situated, file this Class Action Complaint and Jury Demand against Defendants MIDLAND COUNTY, GLADWIN COUNTY, FOUR LAKES TASK FORCE, and FOUR LAKES OPERATIONS COMPANY, INC., (collectively "***County Defendants***"), BOYCE HYDRO, LLC, BOYCE HYDRO POWER, LLC, BOYCE MICHIGAN, LLC, EDENVILLE HYDRO PROPERTY, LLC, and LEE W. MUELLER (collectively "***Boyce Hydro***" or "***Boyce Defendants***"), DANA NESSEL, in her official capacity as Attorney General and her individual capacity, AG DOES 1–10, in their individual capacities, THE MICHIGAN DEPARTMENT OF ENVIRONMENT, GREAT LAKES & ENERGY, in its official capacity, EGLE DOES 11–20, in their individual capacities, THE MICHIGAN DEPARTMENT OF NATURAL RESOURCES, in its official capacity, and MDNR DOES 21–30, in their individual capacities (collectively "***State Defendants***"). Plaintiffs allege upon personal knowledge as to their own actions, and upon the investigation of counsel as to all other matters, as follows:

**INTRODUCTION**

1.      On the evening of May 19, 2020, the Edenville Dam catastrophically failed, causing tens of billions of gallons of water from manmade Wixom Lake to invade downstream communities.

2

2.      The Edenville Dam failure triggered a calamitous, but predictable, ripple effect downstream, including the breach of the Sanford Dam, which released billions more gallons of waters on a path of destruction throughout the floodplain on and around the Tittabawassee River, stretching from Midland into Bay and Saginaw Counties.

3.      A State of Emergency was declared by the Governor of the State of Michigan, and upwards of 10,000 residents were ordered to immediately abandon their valuables and evacuate their homes in the dark of night to seek shelter in nearby schools, or with friends and family, as the flood waters overtook their land.

4.      Adding to the terror and risk of evacuating to shelter in the dark of night, the evacuations occurred in the midst of the deadly Covid-19 pandemic, which required people to maintain a social distance in order to avoid further spread of the virus—a virtually impossible measure under such dire circumstances.

5.      As the sun rose over Lake Huron on May 19, 2020, cataclysmic, ruinous damage was revealed.  Properties were entirely submerged in the ever-rising, muddy waters. Private property, including cars, boats, and houses, continued to be swept away by the devastating currents.

6.      Tens of thousands of stunned and weary downstream residents began to realize the extent to which their lives had been upended, receiving messages from friends and absorbing news reports about the unspeakable harm wrought upon tens of thousands of neighboring properties by the incessant glut of water.

7.      Ultimately, the rising waters along the Tittabawassee River would not crest until the next afternoon at approximately 35.05 feet—more than 20 feet higher than just three days prior—with water levels remaining at or above record highs for days.

3

8.      Jarring images of flood waters overtaking cars and houses have been widely circulated, and, while the extent of the damages is yet incalculable, it is evident that the failure of the Edenville Dam is among the most extensive and costly disasters in the history of the State of Michigan.

9.      While this tragedy remains ongoing as of the date of this filing, with the waters yet to fully subside, it is perhaps too soon for many of the overwhelmed and heart-broken downstream residents to begin asking: why?

10.     While it may bring comfort to believe that the Edenville dam failure was simply an unavoidable natural disaster, it was anything but.  Just like the Four Lakes that precipitated this historic event, this catastrophe was entirely manmade, resulting from conscious and intentional acts by Midland County, Gladwin County, the State of Michigan, and their agents, to raise the water levels on Wixom Lake to dangerously high levels.

11.     The failure of the Edenville Dam was long ago forewarned, clearly so by the Federal Energy Regulatory Commission ("FERC") who revoked Defendant Boyce Hydro's permit expressly because the egregiously deficient condition of the dam and its spillways posed an ongoing and unacceptable risk to the life and property of downstream communities.

12.     The likelihood, and devastating consequences, of the Edenville Dam failure was well known by all Defendants and well documented.

13.     The failure of the Edenville dam was avoidable.

14.     The failure of the Edenville dam was foreseeable.

15.     The longstanding negligence of Boyce Hyrdo in failing to adequately maintain, repair, and improve the Edenville Dam is well-documented.

16.     However, the troubling failure of the Edenville dam was also the result of extraordinary neglect and indifference by Midland and Gladwin Counties, and the State Defendants who intentionally intervened following the revocation of Boyce Hydro's FERC license to raise the water levels on Wixom Lake to dangerous levels, despite knowledge of the grossly inadequate and deficient condition of the Dam.

17.     The intentional concerted campaign by the County and State Defendants to raise the water levels on Wixom Lake was callous, indifferent, and shocking to the conscience and served no legitimate governmental purpose, considering the known calamitous effects that a dam failure at Wixom Lake would have on human life and property.

18.     For more than a year, the State and County Defendants intentionally minimized and obscured the risks posed by the grossly inadequate and defective condition of the Edenville Dam, to the great risk and detriment to lives and property all along the Tittabawassee River.

19.     The purported governmental interests posed by the State and County Defendants for raising Wixom Lake to unsafe levels are shocking and unsupportable when weighed against the lives and property of the People of Michigan.

20.     Despite knowing of the substantial risks posed by the deteriorated and inadequate Edenville Dam, the State and County Defendants intentionally raised the water levels while failing to meet their well-established statutory duties under Michigan Law for ensuring dam safety. Instead, they took callously affirmative actions to substantially increase the known risk to people and property in the heart of Michigan.

21.     Defendants actions caused a grossly indifferent and neglectful deprivation of property to many thousands of Michigan residents.

22.     Plaintiffs bring this action on behalf of themselves and all others similarly situated for negligence, trespass, and violations of the Fourteenth Amendment Due Process Clause to the Constitution of the United States of America.  Plaintiffs and the Class seek an order from this Court requiring Defendants to, among other things, (1) compensate Plaintiffs and the Class for the property damages caused by their deliberately indifferent and neglectful conduct; and (2) provide injunctive relief as the Court deems appropriate, including, but not limited to, constructing, reconstructing, and/or repairing the Edenville Dam and the other dams impounding the Four Lakes to meet federal standards for withstanding the Probable Maximum Flood into the future, and remediation efforts on and around the dams to protect against future private property damage caused by flooding and dam failure.

## PARTIES

23.     Plaintiff Robert Woods is an individual and citizen of Midland, Michigan.

24.     Plaintiff Holly Johnson is an individual and citizen of Saginaw, Michigan.

25.     Defendant Midland County is a municipal corporation organized under the laws of the State of Michigan.

26.     Defendant Gladwin County is a municipal corporation organized under the laws of the State of Michigan.

27.     Defendant Four Lakes Task Force ("FLTF") is a non-profit corporation organized under the laws of the State of Michigan, which at all times relevant hereto acted exclusively as an agent and delegated authority to both Midland and Gladwin County, under the Michigan Natural Resources and Environmental Protection Act, Public Act 451 of 1994, for the purpose of establishing and maintaining the inland lake water levels and dams of Sanford, Wixom, Smallwood, and Secord Lakes (the "Four Lakes").

28.     Defendant Four Lakes Operations Company, Inc. ("FLO") is a for-profit corporation organized under the laws of the State of Michigan, which at all times relevant hereto acted as an agent and/or contractor of the Counties, through Defendant Four Lakes Task Force, for the purpose of maintaining the inland lake water levels and dams of the Four Lakes and acquiring and directing operations of the dams and their power assets.  Defendant Four Lakes Operations Company, Inc. is wholly owned by Defendant Four Lakes Task Force.

29.     Defendant Boyce Hydro, LLC is a for-profit limited liability company organized under the laws of the State of Michigan.

30.     Defendant Boyce Hydro Power, LLC is a for-profit limited liability company organized under the laws of the State of Michigan.

31.     Defendant Boyce Michigan, LLC is a for-profit limited liability company organized under the laws of the State of Michigan.

32.     Defendant Edenville Hydro Property, LLC is a for-profit limited liability company organized under the laws of the State of Michigan.

33.     Defendant Lee Mueller is an individual and citizen of Nevada.  Since March 2007, he has served as the principal co-Member Manager of the Boyce LLCs listed above.

34.     Collectively, the four preceding LLCs will be hereinafter referenced as "***Boyce LLCs***" and inclusive of Mr. Mueller will be referenced hereinafter as "***Boyce Hydro***."

35.     Defendant Dana Nessel is the Attorney General of state of Michigan and an individual citizen of Michigan.

36.     Defendant AG Does 1–10 are individuals who are employed by the Michigan Office of the Attorney General who committed one or more constitutional violations alleged herein.

7

37.    Defendant Michigan Department of Environment, Great Lakes, and Energy ("EGLE") is an agency of the State of Michigan charged with protecting Michigan's environment and public health, including by protecting and managing water and hydroelectric power resources. The Water Resources Division of EGLE ("EGLE-WR") is responsible for regulating Michigan's water resources.  The Dam Safety Unit ("EGLE-WR-DS") is a subdivision of EGLE-WR that is responsible for regulating dam safety.

38.    Defendant EGLE Does 11–21 are individuals who are employed by EGLE and committed one or more constitutional violations alleged herein to deprive Plaintiffs and the Class of their property rights.

39.    Defendant Michigan Department of Natural Resources ("MDNR") is a department of the State of Michigan.

40.    Defendant MDNR Does 21–30 are individuals who are employed by MDNR and committed one or more constitutional violations alleged herein to deprive Plaintiffs and the Class of their property rights.

## JURISDICTION AND VENUE

41.    Pursuant to 28 U.S.C. § 1333 and Article III, § 2 of the Constitution of the United States, this Court has original jurisdiction over this action with respect to the Boyce Defendants and the public and private County Defendants, as this action arises under the Admiralty or Maritime Jurisdiction of the United States.

42.    The wrongs alleged herein against the Boyce and County Defendants respectively of (1) negligently operating and maintaining a dam on a navigable waterway and (2) intentionally causing the water levels of a navigable waterway to increase to unreasonably dangerous levels, occurred on navigable waters of the United States.

8

43.    The incident giving rise to these causes of action—the catastrophic flooding of areas on and around a navigable river and its tributaries—created a potential hazard to maritime commerce.

44.    The activities giving rise to the actions alleged herein—operating and maintaining a dam and increasing and decreasing the water levels of the navigable waters of the United States— are traditional maritime activities and/or bear a substantial relationship to traditional maritime activities.

45.    Uniformity of conduct by dam owners, managers, operators, and/or responsible local governments advances legitimate federal interests, as such conduct directly impacts navigable water levels and the ability of vessels to navigate the waters of the United States. Accordingly, the exercise of federal Admiralty Jurisdiction, and federal common law principles thereunder, is appropriate and necessary.

46.    This Court also has original subject matter jurisdiction over the claims against the State Defendants because the causes of action alleged herein arise under 42 U.S.C. § 1983 and the Constitution and Laws of the United States.

47.    Additionally, this Court has jurisdiction pursuant to the Class Action Fairness Act (CAFA), 28 U.S.C. § 1332(d).  The matter in controversy exceeds $5,000,000, exclusive of interest and costs.  This is a class action in which at least one plaintiff is a citizen of the State of Michigan, and at least one Defendant, Lee W. Mueller, as a co-managing member of Boyce Defendants' LLCs, is a citizen of the State of Nevada.

48.    This Court has personal jurisdiction over the Boyce Defendants because they have availed themselves of the benefits and protections of the Laws of the State of Michigan.

9

49.     All Defendants committed tortious acts and omissions in the State of Michigan, by themselves or through their agents and/or alter egos, causing property damages in the State of Michigan, and this Court has personal jurisdiction over Defendants pursuant to MCL 600.705 and MCL 600.715.

50.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the majority of Defendants are located within this District, a substantial portion of the events or omissions giving rise to the claims occurred in this District, and the property damage alleged herein occurred in this District.

## FACTUAL ALLEGATIONS

51.     The Four Lakes are a network of manmade inland lakes that were each created by manmade dams constructed at multiple points along the Tittabawassee River.

52.     The Tittabawassee River was once a fully navigable waterway that flowed to the south and southeast through Gladwin, Midland, and Saginaw Counties.

53.     In 1976, the FERC, determined that the Tittabawassee River is a navigable waterway of the United States, which was the basis for its continued regulation over the dams creating the Four Lakes.

54.     The Tittabawassee River converges with the Shiawassee River and the Saginaw River, which flows north-northeast into Lake Huron, which is a navigable water that ultimately drains through the Great Lakes system into the St. Lawrence Seaway and access to the Atlantic Ocean.

55.     The Great Lakes and the connected navigable waterways are a critical vein in the United States' system of maritime commerce, and controversies occurring on the navigable waters

10

of the Great Lakes have long formed the basis for state and federal courts adjudicating cases in admiralty.

56.     The dams creating the Four Lakes' standing water reservoirs were constructed in 1924 to generate hydro-electric power.

57.     The construction of the dams were conducted by a private owner/operator, Wolverine Power, which was owned by a wealthy local resident named Frank Isaac Wixom.

58.     Wolverine Power sold all of its rights, property, and assets relating to the dams to Defendant Boyce Hydro Power, LLC, owned by Lee Mueller, in or around 2003, which was previously named Synex Michigan, LLC.

59.     Defendant Boyce Hydro, LLC was formed in 2007, the same year Synex Michigan, LLC changed its name to Boyce Hydro Power, LLC.

60.     The Boyce Hydro Defendants were solely responsible for the ownership of the dams' assets and operation, and maintenance of the dams from the time it was formed until it entered into a purchase agreement with Defendant Four Lakes Task Force ("FLTF") in April 2019.

61.     Boyce Hydro's operation and maintenance of the dams was continuously subject to oversight, permit, and regulation of the FERC.

62.     From north-to-south, the four lakes are: (1) Secord Lake; (2) Smallwood Lake; (3) Wixom Lake; and (4) Sanford Lake.

63.     Each lake is created by a dam and reservoir, with powerhouses that are integral to the dams' production of hydroelectric power, in addition to supporting water level control operations.

64.     The water released through each dam flows downstream in a generally southward direction through the modern riverbed of the Tittabawassee River.

11

*Secord Dam*



65.     The Secord Dam is located approximately 41 miles upstream of the City of Midland.

66.     Secord Lake is approximately 1,100 acres in size.

67.     The Secord Dam is oriented in an east-west direction and consists of four major components, including left embankment, powerhouse, spillway, and right embankment.

*Smallwood Dam*



68.     The Smallwood Dam is located approximately 18 miles northwest of the City of Midland.

69.     Smallwood Lake is approximately 500 acres in size.

70.     The Smallwood Dam is oriented in a northeast-southwest direction and consists of four major components, including left embankment, spillway, powerhouse, and right embankment.

*The Edenville Dam*



71.    The Edenville Dam is a two-section dam located on the Tittabawassee and Tobacco Rivers located near the town of Edenville.  The image above depicts the easternmost Tittabawassee River Section.



72.    The Edenville Dam's two sections span the Tittabawassee River and Tobacco Rivers respectively, with the westwards situated Tobacco River Section depicted above.

14

**73.**     The Edenville Dam created Wixom Lake, which is approximately 2,600 acres in size. Wixom Lake had an approximately 49-mile shoreline.

**74.**     The dam includes the Edenville spillway and powerhouse located on the Tittabawassee River and the Tobacco spillway located on the Tobacco River.

**75.**     There is a 50-foot intake leading to the powerhouse located at the Tittabawassee Section of the dam on the eastern side of the project.

**76.**     The powerhouse contains two 2.4-megawatt (MW) Francis-type turbine generator units for a total installed capacity of approximately 4.8 MW.

**77.**     The total earthen embankment length of the Edenville Dam is approximately 6,600 feet with a maximum height of 54.5 feet.

**78.**     The Highway M-30 causeway effectively divides the embankment with the east side of the embankment impounding water from the Tittabawassee River and the west side of the embankment impounding water from the Tobacco River.

**79.**     The M-30 bridge opening connects the water impounded from both rivers.

**80.**     The left (eastside) embankment of the Tittabawassee River Section extends from natural ground to the gated spillway and is approximately 625 feet long.

**81.**     The right (westside) embankment of the Tittabawassee River Section extends 2,900 feet from the powerhouse to M-30.

**82.**     The minimum crest elevation of the Tittabawassee River Section embankments is approximately 682.1 feet.

**83.**     The left (eastside) embankment of the Tobacco River Section extends 520 feet from M-30 to the Tobacco spillway.

15

84.     The right (westside) embankment of the Tobacco River Section extends approximately 1,895 feet from the Tobacco spillway and ties into natural ground.

85.     The minimum crest elevation of the Tobacco embankment is approximately 682.1 feet.

86.     There are two gated spillway sections, the Tittabawassee and the Tobacco spillways.

87.     The Tittabawassee and Tobacco gated spillways have three steel Tainter (radial) gates each.

88.     From abutment-to-abutment, the Tittabawassee River Section spillway is 68.6 feet wide.

89.     From abutment-to-abutment, the Tobacco River Section Spillway is 72.2 feet wide.

90.     The powerhouse for the Edenville Dam is located adjacent to the Tittabawassee spillway and has a concrete substructure and brick superstructure.  It is approximately 50.6 feet wide and contains two vertical shaft generating units.

91.     During heavy rain events, the Edenville Dam's gates can be opened to discharge excess water and help prevent rising lake levels. However, this capacity is inhibited when the hydroelectric power assets are dormant because additional water cannot flow through the powerhouse when it is non-operational.

*Sanford Dam*



92.     The Sanford Dam is located near the Village of Sanford on the Tittabawassee River approximately 11 miles upstream of the City of Midland.

93.     Sanford Lake is approximately 1,525 acres in size.

94.     The maximum height of the Sanford Dam is 36 feet.

95.     The Sanford Dam consists of four major components, including the left embankment, the powerhouse, the spillway, and the right embankment with fuse plug, which is intended to provide additional spillway capacity during a large flood event.  The fuse plug material is designed to erode and wash out to protect the remainder of the dam.

96.     The spillway section is 149 feet long and includes six Tainter gates.

*The Prized Waterfront Properties on the Four Lakes*

97.     Over the years, substantial residential development along the Four Lakes has occurred.

17

98.     The properties fronting the lakes include lakefront lots and backlots, which do not directly border the lake but include private easement access to the lakes.

99.     Second homes, vacation cottages, and primary residences for the area's wealthier residents now line each of the lakes.

100.    Narrow, approximately half acre residential lots line the lakes and are heavily developed.

101.    Currently, there are 6,555 parcels of private property which front the four lakes and 1,961 parcels of private property that have dedicated easement access to the lakes.

102.    Wixom Lake has 2,875 lakefront parcels, with 828 backlot parcels with lakefront easement rights.

103.    Sanford Lake has 944 lakefront parcels, with 918 backlot parcels with lakefront easement rights.

104.    A significant proportion of residential lakefront lots have a dock that was designed to jut from the shore of each lakefront property into the water, where boats and recreational water toys can be kept and maintained during the summertime.

105.    The property values of lakefront and backlot lake properties are substantially higher on average than country and downstream properties throughout Midland, Bay, and Saginaw County that do not have lake access.

106.    The demand for the availability of summertime recreation on and around the water is substantial and can hardly be overstated.  Property owners paid a premium for their lakefront lots and homes, or their backlot easement access, because of the allure of nice summer days that can be enjoyed by the water, or on the boat.

107.    During the summer, each of the four lakes is home to a buzz of summertime recreational activities, with fishing, jet skis, boats cruising up and down the shore dragging tubes and water skiers, many often anchoring for long, leisurely days in the sun.

108.    Memorial Day weekend attracts throngs of vacationers and residents back to the lakes, and the summer activities begin.

109.    On the 4th of July, Wixom Lake is home to a popular Pontoon Alley party, where lines of boats anchor for a day of music, sunshine, and consumption.

110.    Residents can be seen from the lakes wading in the water, sunning themselves in beach chairs, while kids play on the lawns and splash in the water.

111.    The dams have historically maintained a relatively consistent water level that makes this love of summer recreation on the lakes available to lakefront property holders.

112.    Lake recreation is so important to lakefront residents that, during the FERC permitting process back in 1998, waterfront residents and the Wixom Lake Association petitioned to intervene specifically to request that the water levels be consistently maintained because "large fluctuations of reservoir levels adversely affect boaters and lake-front residences."  The lakefront interveners demanded "that any license issued limit such fluctuations."

### *Boyce Hydro's FERC License and Water Levels on Wixom Lake*

113.    Since approximately 2004, the Boyce Hydro Defendants maintained federal licenses to operate the dams and produce hydroelectric power.

114.    Boyce Hydro took over a previous 1998 license that was issued to prior owner Wolverine Power.

115.    Boyce Hydro's operation of the dams included the for-profit production of hydroelectric energy, which it sold to Consumers Energy.

19

116.    The FERC licenses held by Boyce Hydro also regulated the water elevations of the lakes and the timing to achieve normal summer and winter water elevations.

117.    Historically, Wolverine Power decreased the water levels by three to four feet in the winter to maximize the benefits of hydroelectric power generation and to minimize spilling and overflow during the spring snowmelt run-off.

118.    The Four Lakes were historically refilled to higher summer pool elevations before water temperatures reached levels that would stimulate northern pike spawning, set by the FERC as 39 degrees Fahrenheit.

119.    At the specific request of the Wixom Lake Association and other intervening residents, the FERC license set "normal pool elevation" for Wixom Lake at 675.8 feet National Geodetic Vertical Datum (NGVD), except during winter drawdown.

120.    The winter drawdown level was 672.8 feet NGVD.

121.    No daily fluctuation in the reservoir was permitted that exceeded 0.7 feet.

122.    Winter drawdowns were permitted after December 15, to be completed by January 15, of each year.

123.    Under normal operating conditions, Boyce Hydro's license required it to refill Wixom Lake to summer levels at or prior to the lake reaching 39 degrees Fahrenheit.

124.    Also to honor the wishes of the Wixom Lake Association, which was primarily concerned about home values and outdoor recreation, the FERC permit required a reduced range of water level fluctuations, 0.4 feet above and 0.3 feet below the normal pool elevations.

125.    The required lake elevation level was permitted to be temporarily modified if required by operating emergencies, or for certain project maintenance purposes.

***Boyce Hydro's Egregious Neglect Causes FERC to Revoke Permit for Edenville Dam***

20

126.    Boyce Hydro egregiously failed to operate and maintain the dam in a reasonable condition, causing a substantial and foreseeable threat to downstream residents.

127.    The inadequacy of the Edenville Dams spillways has long been apparent and is well documented.

128.    As early as 1993, FERC consistently advised the Boyce Defendants that the spillway capacity of the Edenville Project did not meet the Commission's guidelines for passing 100% the Probable Maximim Flood (PMF).

129.    PMF is the flood that may be expected from the most severe combination of critical meteorological and hydrologic conditions that are reasonably possible in a particular drainage area.

130.    Under federal regulations, dam operators are required to maintain a dam that can pass 100 percent of the PMF, in order to ensure the safety of downstream life and property.

131.    Since the Boyce Hydro Defendants took over ownership and operation of the Edenville Dam in 2004, over the course of 14 years, federal regulators consistently cited the spillway capacity as grossly inadequate and non-compliant.

132.    The Boyce Hydro Defendants consistently failed to increase the Edenville Dam's spillway capacity, knowingly creating a substantial risk to downstream life and property.

133.    Through a June 15, 2017 Compliance Order, the FERC detailed that Boyce Hydro: (1) failed to increase the capacity of spillways to enable them to pass the [PMF] as required by Regional Engineer directives, license Article 4, and Part 12 of the Commission's regulations; (2) performed unauthorized dam repairs in violation of Regional Engineer directives and Part 12 of the Commission's regulations; (3) performed unauthorized earth-moving activities in violation of Standard Articles 19-21 of the license; (4) failed to file an adequate Public Safety Plain in violation of Regional Engineer directives and Part 12 of the Commission's regulations; (5) unduly restricted

public access to project facilities and failed to construct approved recreation facilities in violation of Standard Article 18 and Article 410 of the license and the Commission's Orders Modifying and Approving Recreation Plan; (6) failed to acquire and document all necessary project property rights in violation of Standard Article 5 of the license; and (7) failed to comply with the Commission's 1999 Order approving Boyce Hydro's Water Quality Monitoring Plan in violation of that order and Article 402 of the license.

134.   The 2017 Compliance Order stated that Boyce Hydro has shown a pattern of delay and indifference to addressing dam safety requirements.

135.   The 2017 Compliance Order also stated that the Edenville Dam's inadequate spillway capacity must be remediated to protect life, limb, and property.

136.   Through a February 15, 2018 Order Proposing Revocation of License, FERC stated that "[t]he Commission's primary concern has been the licensee's longstanding failure to address the project's inadequate spillway capacity, *which currently is designed to pass only approximately 50 percent of the PMF. Failure of the Edenville dam could result in the loss of human life and the destruction of property and infrastructure*."[1] (Emphasis added).

137.   Boyce Hydro failed to comply with numerous, specific orders by the FERC, including to even develop plans, specifications, and a schedule to construct a Tittabawassee River Auxiliary Spillway, which would ensure the known, necessary improvements to the Edenville Dam's spillway capacity.

---

[1] https://www.ferc.gov/whats-new/comm-meet/2018/021518/H-2.pdf (last visited May 24, 2020).

138.    In the face of known and well-documented risk to downstream life and property, Boyce Hydro failed to conduct necessary maintenance and repairs, further increasing the risk of dam failure and catastrophic downstream injuries.

139.    As a result of Boyce Hydro's failure to maintain the dam and make necessary and reasonable repairs, the FERC issued a September 10, 2018 Order Revoking Boyce Hydro's license to operate the Edenville Dam.

140.    Boyce Hydro's licenses to operate dams on the other three lakes remained in force.

141.    As a direct and proximate result of Boyce Hydro's failure to maintain the dam in safe condition and make the necessary repairs to protect life and property, the Edenville Dam remained at least as hazardous from September 10, 2018 until May 19, 2020—when the Edenville Dam predictably and catastrophically failed.

### Defendants Knew that the Edenville Dam was in Grossly Deficient Condition and the Disastrous Consequences of Dam Failure

142.    After Boyce Hydro lost its permit to operate the Edenville Dam, it no longer had any incentive to continue maintaining the historically "normal" water levels—nor should it have in the face of repeated, dire warnings of a catastrophic dam collapse of the Edenville Dam.

143.    Boyce Hydro's license to legally produce and sell hydroelectric power was gone, and the operation of the Edenville Dam no longer remained profitable.

144.    Without operational hydroelectric power assets, water flow from Wixom Lake no longer flowed through the Edenville Dam powerhouse.  Instead, water flow travelled exclusively through its other gates and the damaged spillway, which created additional risks of deterioration and damage to the already grossly deficient spillway.

145.    From September 25, 2018 onward, the Edenville Dam was under the regulatory and enforcement jurisdiction of EGLE and the MDNR as it related to dam safety.

23

146.    State Defendants knew about the FERC record and the deficient, dangerous, and inadequate condition and capacity of the Edenville Dam.

147.    State Defendants also had voluminous documents reporting on the condition of the Edenville Dam, which the FLTF's own engineer expressed would not meet the already lax state safety standards.

148.    Defendants knew of the risks posed by a high hazard dam failure, as proven by the catastrophic flooding that resulted from the 2017 Oroville Dam failure in California, which caused the evacuation of more than 180,000 residents and massive downstream property damages.

149.    The County Defendants knew all too well what the dire consequences that a dam failure at Wixom Lake would befall downstream residents, the City of Midland, and its largest employer, Dow Chemical.

150.    The City of Midland has spent substantial resources modeling flood scenarios. Midland's flood modeling long ago demonstrated the disastrous consequences that an upstream dam failure would cause, during both fair and severe weather events (see Potential Flood Map below).



**151.** Midland County and its officials have also long been aware of dam failure risks at the Edenville Dam.

**152.** The County Defendants also knew about the grossly deficient condition of the Edenville Dam spillway and all of the FERC enforcement actions which eventually led to the revocation of the Boyce Defendants' permit.

### Boyce Defendants Significantly Decrease Water Levels in Wixom Lake in Response to Losing FERC License

**153.** In response to the revocation of its license, beginning on September 20, 2018, Boyce Hydro began to drawdown the water levels in Wixom lake.

**154.** Boyce Hydro claims that the drawdown of Wixom Lake's water levels was to perform dam safety-related spillway and gate assessments.

**155.** The drawdown of Wixom Lake levels was necessary to ensure the safety of life and property, given the high hazard classification of the Edenville Dam and its grossly deficient, inadequate, and dangerous condition.

**156.** FERC granted Boyce Hydro variances to conduct the drawdowns through orders dated September 14, 2018 and September 19, 2018.

**157.** The Wixom Lake drawdown initially performed by Boyce Hydro brought water levels down approximately 4.6 feet below the normal pond elevation of 675.8 NGVD to 671.2 NGVD.

**158.** Once its FERC license was revoked, Boyce Hydro remained under no obligation to maintain historically "normal" lake levels in the face of such severe risk and potential liability.

**159.** In 2018, in anticipation of winter freezing, Boyce Hydro further decreased Wixom Lake levels to a "Run-of-River" (ROR) level controlled by the natural flow of water.

160.    The ROR level was approximately 669 NGVD, 6.8 feet below the previously operational lake levels and 3.8 feet below the prior winter drawdown levels set by the FERC license.

161.    Boyce Hydro maintained this level from October 2018 through April 8, 2019, except for instances of rainstorm or precipitation-related fluctuations.

162.    Beginning November 12, 2019, again in anticipation of winter freezing, Boyce Hydro brought down the Wixom Lake levels to approximately ROR levels of 669.2 NGVD.

163.    The Wixom Lake water levels were decreased between 6 and 8 feet below the historic "normal" summer levels and maintained that way for most of the winter of 2019-2020.

***Lakefront Residents Become Outraged when Four Lakes Outdoor Recreation Threatened***

164.    The Wixom Lake water level drawdowns sparked outrage from local property owners, who feared loss of summertime recreation, diminished property values, and decreased tourism to the lakes.

165.    Water levels at or around 669 NGVD were too low to allow the installation and use of many docks and boat lifts on Wixom Lake.

166.    Those decreased levels also caused the closure of certain public boat ramps on Wixom Lake.



167.    In response, the local homeowners' associations lobbied the County Defendants to do something to get lake levels back to historically "normal" levels.

***The County Defendants Form a Task Force to Intentionally Increase Water Levels in Wixom Lake to Dangerously High Levels, Despite Grossly Defective and Inadequate Edenville Dam Spillway***

168.    The homeowners' associations formed the Four Lakes Task Force (FLTF), a non-profit that previously operated under the name "The Sanford Lake Preservation Association," to lobby the County Defendants to take control over the water levels and protect their property interests.

169.    The County Defendants appointed Defendant Four Lakes Task Force to act as its "Designated Authority" to initiate, on its behalf, proceedings under Part 307 of the Michigan Natural Resources and Environmental Protection Act ("Part 307") to set required lake levels for each of the Four Lakes.

170.    In April 2019, the County Defendants financed a $400,000 study commissioned by the FLTF to have Spicer Group, Inc. prepare a "Four Lakes Level Study," for the purpose of petitioning the Midland County Circuit Court to intervene and require that the lake levels, particularly Wixom Lake, be increased to meet the demands and expectations of lakefront property owners.

171.    By joint resolution of the Counties in forming and appointing the FLTF, the County Defendants specifically stated that "Wixom Lake, Sanford Lake, Smallwood Lake, and Secord Lake are important resources in Gladwin and Midland Counties, and the continued operation of the dams and water levels are of paramount importance to the environment, recreation, property values of lake residents, and the public and economic health of Gladwin and Midland Counties[.]"

172.    By joint resolution, the FLTF was to be composed of two members from the Wixom Lake Association, one member from the Sanford Lake Association, one member from the Sanford Lake Preservation Association, and (optionally) one member from each from associations representing Smallwood and Secord Lake.

173.    The optional inclusion of members from the northernmost Smallwood and Secord Lakes, which remained largely unaffected by the water level drawdowns of Wixom Lake, clearly demonstrates that the primary purpose of the FLTF was to increase the Wixom Lake Levels, despite the dangerous condition of the Edenville Dam.

174.    Downstream residents and property holders were expressly excluded from the FLTF.

175.    The FLTF was formed to benefit the property values and interests of the lakefront and backlot property owners whose values and property use were adversely affected by the water level drawdowns on Wixom Lake.

176.    With input exclusively from lakefront property owners and Spicer Group, Inc., the FLTF petitioned for and obtained an order from the Midland County Circuit Court requiring Boyce Hydro to dramatically increase the water levels on Wixom Lake to unsafe levels.

177.    In petitioning the Court for increased water levels on Wixom Lake, the County Defendants, through the FLTF, Spicer Group, Inc., minimized, excluded, and/or intentionally obscured the dire warnings from FERC regarding the grossly deficient condition of the Edenville Dam and its spillways.

178.    While the Spicer Group, Inc. report stated that Boyce Hydro's FERC license was revoked, it provided vague and obscure reasons for the revocation, stating only that it was "because the dam was determined to be non-compliant with FERC regulations."

179.    The report further stated that "[t]he FLTF is not aware of objections or violations from MDEQ [EGLE] or MDNR[,]" which had not by that point conducted any thorough inspections or performed substantial regulatory oversight.

180.    As described below, this statement is highly misleading, as the only inspection conducted by EGLE's dam safety unit in 2018 documented numerous defects and warning signs that the dam was sorely in need of maintenance and repair to operate in a reasonably safe manner.

181.    The report stated that "Boyce Hydro and the FLTF have an agreement that water level will be restored for the summer of 2019, with the understanding that the MDEQ will permit this provided that a normal legal lake level is established and repairs to the Edenville Dam are implemented by 2024"—five years into the future.

182.    The report further stated that "[t]he primary objectives of Midland and Gladwin Counties submitting the petition to the Circuit Court are to maintain levels into the future, ensure all dams *become* and remain compliant with state safety standards, acquire rights to operate and maintain the dams and lake bottoms and establish a local authority that will be responsible to manage the dams." (Emphasis added).

183.    The plan was to increase the water levels first, then conduct necessary maintenance and repairs later, despite knowing that the dam was non-compliant with even the State of Michigan's lax standard for withstanding 50% PMF.

184.    The study further stated that "[t]he establishment of legal lake levels is in the best interest of property owners surrounding the lakes … The current situation at the Edenville Dam and Wixom Lake, where the FERC license was revoked in September 2018, is an example of what can happen in the absence of a legal lake level order."

29

185.    With respect to the horrifyingly deficient condition of the Edenville Dam's spillway capacity—which the FERC had deemed less than 50% capable of withstanding a PMF and a high hazard and serious and immediate threat to downstream life, limb, and property—the report stated only that "***modest improvements*** to spillway capacity at Wixom Lake" will be required. (Emphasis added).

186.    The report further minimized and obscured the obviously deficient condition of the Edenville Dam, stating that "[i]n general, signs of instability or structural fatigue have not been observed but repairs and maintenance are needed."

187.    While the report included the prior FERC licenses as Appendix D, it entirely omitted the many, detailed regulatory violations at the Edenville Dam and failed to attach the many non-compliance letters and orders detailing the extremely dangerous condition of the dam's spillways.

188.    The report failed to even attach the "cursory" 2018 EGLE inspection, which documented numerous maintenance and repair issues.

189.    The report also failed to attach the order revoking Boyce Hydro's license.

190.    The Part 307 proceedings initiated by the County Defendants occurred in a non-adversarial setting, and downstream property owners who were directly threatened by a dam failure and federal regulators with documentation and knowledge regarding the dam's grossly deficient spillways were not provided a seat at the table.

191.    On May 28, 2019, the County Defendants obtained an order from the Midland County Circuit Court, which required that the water levels on Wixom Lake be dramatically increased from the post-September 2018 drawdown levels.

192.    Under the new order, the County Defendants obtained the following levels:

30

| Lake | Summer Level (NGVD 29) | Winter Level (NGVD 29) |
|---|---|---|
| Sanford Lake | 630.8 | 627.8 |
| Wixom Lake | 675.8 | 672.8 |
| Smallwood Lake | 704.8 | 701.8 |
| Secord Lake | 750.8 | 747.8 |

193.    At the time of the Part 397 Order, Wixom Lake levels were substantially lowered to approximately 669 NGVD in the interest of safety.

194.    EGLE advocated for the prior Part 307 Order approving dramatic, required *increases* to the water levels on Wixom Lake—despite no inspection with water levels raised and no evidence that the dam could withstand such increased water levels.

195.    Representing EGLE, Assistant Attorney General Daniel P. Bock appeared in apparent support for the Part 307 petition and signed the order approving dramatically increased water levels on Wixom Lake.

196.    The MDNR, through Assistant Attorney General Luanne Laemmerman, also appeared and signed the order dramatically increasing the water levels on Wixom Lake.

197.    Gladwin County, Midland County, and the FLTF all appeared to advocate for increased water levels and sign the Part 307 Order, despite no evidence that those increased water levels were safe.  They were not.

### *The County Defendants Enter into a Purchase Agreement with Boyce Hydro to Acquire the Dams and Assume Control Over Increased Lake Levels*

198.    On or around April 24, 2019, Boyce Trusts and Defendant FLTF agreed upon a $9.4 million purchase agreement by which historic summer lake levels would be restored on

31

Wixom Lake, and the FLTF, acting as an agent of the Counties, would take ownership over all dam assets and assume oversight, management, and control over operations of the dams.

199.    Upon information and belief, Boyce Trusts operates under the corporate name of Defendant Edenville Hydro Property, LLC, and owns the assets associated with the Edenville Dam.

200.    After the Purchase Agreement was reached, the local ABC 12 News station in Midland County published an article entitled, "Tentative deal could save summer on Wixom Lake."

201.    One local lakefront resident who commented on the story said, "I was so elated. I just built a new house last year and the water went down, so I was really panicking[.]"

202.    Another local lakefront resident was quoted as follows: "I was just so happy I went out and looked out the back window and said, 'oh the water is coming up'. So I was really happy about it."

203.    In another article published by MLive entitled "Wixom Lake to become a lake again after tentative $9M deal," another lakefront property owner commented that, "[p]eople aren't going to buy lakefront property without water,"

204.    The Final Purchase Agreement was signed on December 31, 2019 by County Defendants and Boyce Hydro Defendants.

205.    The Agreement guaranteed that the County Defendants would have oversight and control over the lake level assets which control the lake levels on Wixom Lake.

206.    The Agreement provided that all power assets of the dams relating to the production of hydroelectric power would be transferred to County Defendants.

32

207.    In April 2019, the FLTF, as an agent and designated authority of County Defendants, formed a wholly owned private entity, Four Lakes Operations, Inc. ("FLO").

208.    The FLTF planned to eventually transfer all power assets of the dams relating to the production of hydroelectric power to FLO, so that FLO could sell the energy for a profit.

209.    In January 2020, when the Purchase Agreement was executed, FLTF began delegating oversight authority to FLO, and FLO became at least partially responsible for ensuring that the Boyce Defendants increased water levels on Wixom Lake.

210.    At all relevant times hereto, and upon information and belief, FLO was wholly owned by FLTF, sharing common assets, agents, and directors.  As of May 2020, FLO was merely a sham and continuation of the FLTF, operating as an undercapitalized entity without any separate corporate purpose because none of the power assets of the Edenville Dam were then operational.

211.    Any and all actions taken by Boyce Hydro and its agents with respect to setting lake levels were under the sole discretion, control, direction, and management of the County Defendants, including FLO, beginning in January 2020.

212.    The Purchase Agreement included guarantees, explicit and implicit, that the water levels would be increased by between 6 and 8 feet during the spring of 2020.

***In a Shocking Disregard for Human Safety and Property, State Defendants Ignore Dam Safety Regulations and Engage in Pressure Campaign to Raise Wixom Lake Levels, Purportedly to Save Freshwater Mussels***

213.    Starting in September 2018, when FERC revoked Boyce Hydro's license, the State Defendants became the only governmental authorities with regulatory and enforcement jurisdiction over the grossly inadequate and deteriorated condition of the Edenville Dam.

214.     However, from September 2018 until the Edenville Dam failure on May 19, 2020, none of the State Defendants took any action to address the deterioration of the dam and its known,

inadequate spillway capacity; instead, they set out on a crusade to raise water levels and, purportedly, save the freshwater mussel population.

215.    EGLE conducted its only inspection of the Edenville Dam in October 2018, which EGLE itself characterized as "cursory."

216.    EGLE-WR-DS agent Jim Pawlowski characterized the dam as in "fair structural condition" but noted that "[t]he dam's two concrete spillways showed signs of moderate deterioration (spalling, exposed reinforcing steel, minor cracking and efflorescence), but appeared to be stable and functioning normally."

217.    The images attached to the "cursory" inspection report depicted erosion on the embankments, significant spalling, exposed reinforced steel, and a "failing retaining wall downstream of the left abutment."

218.    During the inspection, due to Boyce Hydro's drawdowns of the water level, Wixom Lake was at a safer level, approximately 4.1 feet below its normal pool elevation.  Accordingly, at the time of the inspection, no water was abutting the earthen embankment.

219.    Also at the time of the inspection, Mr. Pawlowski noted that no water was flowing through the powerhouse.

220.    Despite the deteriorated conditions of the dam, EGLE failed to conduct any follow up inspection of the Edenville Dam, despite later admitting through its website that it was concerned that "the dam did not have enough spillway capacity—which allows water to flow out of the Wixom Lake impoundment—to meet state requirements."

221.    The State of Michigan only would have required the Edenville Dam to meet 50% PMF, and none of the engineering or regulatory opinions at State Defendants' disposal supported that the Edenville Dam could meet the State's already lax standard.

222.    The FERC enforcement documents clearly demonstrate that it could not.

223.    The State Defendants all appeared and advocated for the Part 307 Order, despite failing to meet their regulatory obligations in the interest of human life and property rights.

224.    Under Part 307, FLTF, as delegated authority of the Counties, was required to cause an inspection to be made of the dam, for which a normal lake level was set.  Under MCL 324.30722 (2), "[i]f a report discloses a need for repairs or a change in condition of the dam that relates to the dam's safety or danger to natural resources, the department shall conduct an inspection to confirm the report.  ***If the report is confirmed and the public safety or natural resources are endangered by the risk of failure of the dam, the department may require the county either to repair or to replace the dam***." (emphasis added).

225.    A September 18, 2019 memorandum from a FLTF-commissioned dam safety engineer to a purported EGLE engineer allegedly concluded that "[a]t this point in time, based on the documents reviewed, the FLTF does not believe that the Edenville Dam can be operated to meet the EGLE dam safety requirements to pass the [50%] PMF without certain repairs and improvements."

226.    Despite disclosure and knowledge of the desperate need for repairs, EGLE failed to conduct a thorough follow-up inspection of the dam as required by statute, failed to inspect the dam at a time when water levels were at historically normal levels, and failed to heed the dire warnings in the voluminous FERC record documenting the awful and dangerous condition of the dam and its spillways and warning of risks to life, limb, and property.

227.    Under MCL 324.30722 (3), "[a] person failing to comply with this section, or falsely representing dam conditions, is guilty of misconduct in office."

228.    Not only did EGLE fail to conduct a proper inspection during the Part 307 process, and fail to order that the Edenville Dam be repaired, the MDNR allegedly sent a letter on October 2, 2019 to EGLE-WRD opposing the interim measures previously approved by the FERC to reduce the risk of flooding, including drawdowns of Wixom Lake because of concern for freshwater mussels and fish.

229.    Unconscionably, the State Defendants took a series of concerted legal actions to pressure Boyce Hydro to disregard any safety concerns and force water levels back up, using the Part 307 Order it previously advocated for as leverage.

230.    Shockingly, the legal actions by State Defendants were purportedly taken in order to protect freshwater mussels and fish who might be endangered by lowered water levels on Wixom Lake.

231.    The State Defendants made numerous regulatory communications to Boyce Hydro threatening to file a lawsuit seeking damages for harm allegedly done to the freshwater mussel population.

232.    On January 21, 2020, counsel from Defendant Dana Nessel's Office allegedly emailed counsel for Boyce Hydro threatening litigation to recover damages and order requiring Boyce Hydro to restore and repair the "millions of freshwater mussels" that the Attorney General's Office alleged were killed as a result of the Wixom Lake drawdown.

233.    EGLE and MDNR, on November 2, 2018, November 9, 2018, and November 14, 2018, conducted extensive mussel surveys on Wixom Lake, while its water levels were low.

234.    Then again, on December 13, 2019, December 20, 2019, and December 23, 2019, EGLE and the MDNR conducted additional mussel surveys, again while water levels were low.

235.    During this time, no additional dam safety inspections were conducted.

36

236.   The State Defendants alleged that decreased water levels caused the deaths of millions of freshwater mussels.

237.   On May 1, 2020—shortly before the catastrophic collapse of the Edenville Dam—Attorney General Nessel filed a lawsuit demanding that the *water levels on Wixom Lake be raised* in order to protect the lives of mussels and freshwater wildlife—with no apparent consideration for the lives and property of surrounding human communities.

238.   The State Defendants' lawsuit alleged that "Defendants wrongfully exerted dominion over the freshwater mussels and caused their death, which denies and is inconsistent with the State's rights to them[.]"

239.   In violation of Part 307, the State Defendants failed to conduct any follow-up inspections of the Edenville Dam, despite numerous, known reports of the urgent need for repairs and unsafe conditions due to inadequate dam conditions and capacity.

240.   State Defendants further failed to order County Defendants and/or Boyce Hydro Defendants to halt any increases in the water levels, as required of them under Part 307 when a report indicates a threat to life and property.

241.   Instead, the State Defendants took out on a crusade to, purportedly, save the freshwater mussel population in Wixom Lake, at the great risk and expense of Plaintiffs and the Class.

242.   State Defendants' conduct in the face of known dangers to neighboring human communities deprived Plaintiffs and the Class of their property, shocks the conscience, and constitutes a reckless disregard for the property rights of those harmed by the failure of the Edenville Dam.

*In April-May 2020, Defendants Intentionally Raised Wixom Lake Levels, Causing the Direct, Catastrophic Flooding of Tens of Thousands of Downstream Properties*

243.    On or around April 15, 2020, Boyce and County Defendants began refilling Wixom Lake by approximately 8 inches per day, until it reached the established summer level of 675.8 NGVD on or around May 3, 2020.

244.    The timing of the spring refill of Wixom Lake was particularly careless given that late-April and May are historically high season for heavy rainfall precipitation and water runoff.

245.    The Boyce and County Defendants knew that the Edenville Dam floodways remained in grossly inadequate condition, but intentionally increased the Wixom lake levels during the rainy season anyway in order to meet the demands of summer recreation.

246.    In real time, the Wixom Lake Housing Association publicly celebrated Defendants' actions increasing the lake levels by 6 to 8 feet, publishing regular updates applauding the "Spring Refill."

247.    At the time, the Governor's Emergency Covid-19 orders still prohibited boating and other recreational activities on the lake. Yet, lakefront property owners remained very eager to get the levels back up so they could get their boats in the water as soon as possible.

248.    Just two weeks after Defendants intentionally filled Wixom Lake by 6 to 8 feet to restore boat access to lakefront residents, disaster struck.

249.    The Edenville Dam's eastern spillway predictably failed on May 19, 2020, when its grossly deficient and inadequate spillway capacity was overcome by rising waters during a spring rain event.

250.    The powerhouse was non-operational at the time and further contributed to the dam's decreased spillway capacity.

251.    The earthen embankment on the eastside of the dam dramatically eroded and collapsed, causing a rush of water to charge downhill, draining tens of billions of gallons of water from Wixom Lake downstream into the floodplains below.

252.    As a direct and proximate result of the Edenville Dam failure, the avalanche of water overtopped the Sanford Dam to the south, creating an imminent, massive flood downstream that pummeled the City of Midland and many thousands of downstream properties.

253.    Defendants knew that there was a substantial and unreasonable risk of dam failure at the Edenville Dam, and they knew that increased water levels substantially increased the risk that such a failure would occur.

254.    The Tittabawassee River has long carried all excess waters flowing through the dams creating the Four Lakes, and Defendants knew that, in the absence of the dams impounding the lakes, many thousands of downstream properties would be overtaken by water.

255.    Defendants intentional acts over the course of more than a year to increase water levels—whether to protect parochial property interests, summer recreation, or the freshwater mussel population—constituted a shocking disregard for the lives and properties of Plaintiffs and the Class who were endangered by the dam.

256.    Defendants' acts were a wrongful abuse of governmental authority that created an obvious danger to life and property that did not exist prior to Defendants' exercise of authority over the dam and its water levels.

257.    The calculated act of raising the levels of Wixom Lake, impounded by a knowingly inadequate and defective dam that had been grossly maintained and repaired by Boyce Hydro for more than a decade, caused the catastrophic, but sadly predictable, failure of the Edenville Dam.

258.    It will take many years for residents to recover from the intentional and negligent actions of Defendants that unspeakable harm to their lives and properties, including significant and universal declines in property values for the indefinite future.

259.    Ironically, the very lakefront properties that the County Defendants' initially sought to enhance and protect were also harmed by Defendants' acts.  Wixom Lake has been completely drained because of the Edenville Dam failure—with the dam impounding its waters indefinitely destroyed and far worse for the wear.

260.    The failure of the Edenville Dam was a manmade creation, just like the lake it impounded.  The failure was foreseeable, avoidable, and the result of negligent and intentional conduct by Defendants to provide summer recreation and purportedly protect the freshwater mussel population, at the tragic expense of the many communities so devastatingly harmed.

### *Plaintiff Robert Woods*

261.    Plaintiff Robert Woods is a resident of Midland, Michigan and owns property at 3000 Valorie Lane, Midland, Michigan 48640.

262.    On or around the evening of May 19, 2020, Mr. Woods and his wife Linda were subjected to the Governor's emergency evacuation order and evacuated their home, leaving behind prized valuables and property.

263.    As of May 23, 2020, Plaintiffs remained evacuated and were unable to habitate their home.

264.    They attempted to return to their home on Wednesday, May 19, but the water was too high into the street.

265.     On Thursday, May 20, they were finally able to get inside their home and discovered substantial property damage, including approximately 5 feet of water in their basement that had obviously invaded through the window wells.

266.     Due to the severity of the damage and continuing risk posed by the flood waters, they were unable to remain in their home.

267.     The damage to Plaintiff's property was caused by overland flooding resulting from the Edenville Dam failure.

268.     As a direct and proximate cause of the Edenville Dam failure, Plaintiff sustained many thousands of dollars in property damages and loss of value.

269.     Plaintiff did not contribute to the damage incurred to his property.

### *Plaintiff Holly Johnson*

270.     Plaintiff Holly Johnson is a resident of Saginaw, Michigan at 575 Adams St., Saginaw, Michigan 48609, where she resides with her husband Victor.

271.     Plaintiff resides adjacent to the current path of the Tittabawassee River and within the Class Area.

272.     Plaintiff was forced to evacuate her home as a result of the Edenville Dam failure.

273.     Due to the flooding, Plaintiff remained evacuated and unable to habitate her home as of May 22, 2020.

274.     Plaintiff returned to her home and discovered that her entire finished basement was flooded to the ceiling, with water at an estimated height of 8 feet.

275.     As of this filing, she has discovered that her H-Vac system, washer, dryer, couch, television, fully furnished living area, and personal belongings were destroyed.  Her garage also

sustained substantial overland flooding.  She is yet to determine the full extent of the damages due to the evacuation.

276.    As a direct and proximate cause of the Edenville Dam failure, Plaintiff sustained many thousands of dollars in property damages and significant loss of value.

277.    Plaintiff did not contribute to the damage incurred to her property.

## CLASS ALLEGATIONS

278.    Plaintiffs bring this action individually and on behalf of all persons as the Court may determine to be appropriate for class certification, pursuant to Fed. R. Civ. P. Rule 23. Plaintiffs seek to represent a Class of persons preliminarily defined as:

> *All individuals and entities who had floodwaters invade their property on May 19 or May 20, 2020 and hold property interests within the affected flood plain surrounding the historic path of the Tittabawassee River and any of its affected tributaries.*

The definitional boundary is subject to modification as discovery will disclose the location of all class members and the affected flood plain.  Plaintiffs reserve the right to propose one or more sub-classes if discovery reveals that such subclasses are appropriate.

279.    The reason for not joining all potential class members as Plaintiffs is that, upon information and belief, there are tens of thousands of potential plaintiffs, thereby making it impractical to bring them before the Court.

280.    There are many persons who have been similarly affected, and the question to be determined is one of common and general interest to many persons constituting the class to which Plaintiffs belong, and is so numerous as to make it impracticable to bring them all before the Court, for which reason Plaintiffs initiate this litigation for all persons similarly situated pursuant to Fed. R. Civ. P. 23.

281.     Issues and questions of law and fact common to the members of the Class predominate over questions affecting individual members and the claims of Plaintiffs, are typical of the claims of the Class.

282.     The claims of Plaintiffs and the Class are typical of the claims of absent class members.

283.     The manner and process by which named Plaintiffs were harmed is common to those of the Class and they are pursued under the same legal theories as are applicable to the Class.

284.     The putative class is ascertainable.

285.     Declaratory and/or injunctive relief is appropriate under these circumstances, as such relief will commonly benefit and affect Plaintiffs and the Class as a whole.

286.     Separate adjudications will create a risk of decisions that are inconsistent with or dispositive of other class members' claims.

287.     The maintenance of this litigation as a Class Action will be superior to other methods of adjudication in promoting the convenient administration of justice.

288.     This case is appropriate for certification under Rule 23(b)(3).  Common issues of fact and law predominate over questions affecting only individual Class Members and a class action is the superior means for litigating this case.

289.     Plaintiffs and the law firm of Liddle & Dubin, P.C., (L&D) will fairly and adequately assert and protect the interests of the Class.

L&D has successfully practiced environmental class litigation under Michigan Law on behalf of flood victims for almost 30 years, with a combined experience of more than 50 years among its five outstanding attorneys.  L&D has successfully litigated complex class actions on behalf of more than 50,000 flooding victims throughout the Midwest over the course of decades.

43

L&D is among very few law firms in the United States to maintain a consistent, successful legal practice protecting the rights of flooding victims whose property has been damaged by both overland flooding and sewage backup events.  L&D has been involved in virtually every major flooding case in the State of Michigan over the past 20 years.  L&D attorneys have the experience and technical knowledge about the public and private infrastructure that contributes to flooding events, and the firm is unmatched in its knowledge and expertise regarding proof of damages in flooding cases.  L&D has litigated and successfully obtained highly beneficial results for hundreds of thousands of Michigan residents in many dozens of complex class cases, in jurisdictions throughout the country, and the firm has the outstanding staff and resources necessary to get the job done on a class basis.  L&D's practice exclusively involves class litigation, and L&D has continuously litigated environmental and property damage cases for over 20 years.  L&D is the best-positioned firm in the country to take on this important, complex class case on behalf of the devastated residents of Mid-Michigan.

## COUNTS I and II

### Negligence and Gross Negligence

### (against all *Boyce Defendants* and *County Defendants*)

290.   Plaintiffs restate all allegations in the complaint as if fully stated herein.

291.   Defendants owed Plaintiffs and the Class a duty to exercise reasonable care.

292.   Defendants duty of reasonable care included the duty to:

    a.   Maintain the Edenville Dam and its spillways in a condition of repair adequate to protect against dam failure;

    b.   Maintain water levels at a reasonably safe level under the circumstances so as not to unreasonably threaten surrounding life and property;

44

      c.      Disclose all relevant information to regulatory authorities whether the dam in deficient and inadequate condition and needed maintenance and repairs that were necessary to the protection of life and property;

      d.      Make all necessary maintenance and repairs to ensure the stability and security of the dam and its embankments;

      e.      Maintain or repair the Edenville Dam to withstand overtopping and the loading condition that would occur during a flood up to the PMF;

      f.      Particularly after notice of violation and FERC order, to increase the known, inadequate spillway capacity of the Edenville Dam to take all reasonable measures available to prevent predictable dam failure;

      g.      Otherwise take reasonable measures to protect against and mitigate the risks to life, limb, and property that would result from dam failure.

293.    Defendants negligently breached their duty of reasonable care by failing to take some or all of the reasonable measures listed above.

294.    Defendants actions and omissions were willful, knowing, intentional, callous, and made with a conscious disregard for the life, property, and safety.

295.    Plaintiffs and the Class have suffered extraordinary harm to property as a result of Defendants' breach of its duties and they will be forced to expend significant resources to remediate the effects which Defendants' negligence and gross negligence has caused.

296.    As a direct and proximate result of Defendants' actions and/or omissions in breaching their duties of care, Plaintiffs have suffered extensive damages, past, present, and future, including but not limited to:

      a.      Extensive physical property damage and/or destruction;

      b.      Diminution in property values;

      c.      Loss of use and enjoyment of property;

      d.      Loss of access to property;

      e.      Substantial economic losses resulting from the physical damages to real and personal property;

      f.      Non-economic damages, including annoyance, discomfort, and inconvenience resulting from the dam failure;

      g.      Other damages to be determined through discovery.

297.    Plaintiffs and the Class hereby request monetary damages, and all other damages permitted by law including damages resulting from annoyance, discomfort, and inconvenience, non-economic damages, punitive damages, and attorneys' fees and costs.

298.    Plaintiffs demand injunctive relief to return Plaintiffs and the Class to the status quo, as the Court may deem equitable under the circumstances, including but not limited to, constructing, reconstructing, and/or repairing the Edenville Dam and the other dams impounding the Four Lakes to meet federal standards for withstanding the Probable Maximum Flood into the future, and remediation efforts on and around the dams to protect against future private property damage caused by flooding and dam failure.

299.    Plaintiffs' claims are not barred by governmental immunity.

<u>**COUNT III**</u>
**Trespass**
**(against *Boyce Defendants* and *County Defendants*)**

300.    Plaintiffs restate all allegations in the complaint as if fully stated herein.

301.    Plaintiffs and the Class maintained the right to exclusive possession and use and enjoyment of their land and property.

302.     Defendants caused a direct or immediate intrusion of substantial and unreasonable overland floodwaters onto the properties of Plaintiffs and the Class.

303.     Defendants' wrongs causing the unlawful intrusions occurred upon navigable waters, and Plaintiffs and the Class were directly harmed by the invasion of excess waters overflowing from a navigable waterway.

304.     Defendants' intrusion onto the properties of Plaintiffs and the Class was intentional and unreasonable, reckless, and/or the result of ultrahazardous conduct.

305.     Defendants' conduct was the direct and proximate cause of the invasion of water onto Plaintiffs' and the Class' properties.

306.     Plaintiffs and the Class did not authorize Defendants' conduct or the invasion of flood waters onto their properties.

307.     Any public interest which may have been served by the unlawful invasion of the properties of Plaintiffs and the Class was clearly outweighed by the unreasonable risk and catastrophic harm suffered.

308.     As a direct and proximate result of Defendants' conduct, Plaintiffs and the Class have suffered extensive damages, past, present, and future, including but not limited to:

    a.     Extensive physical property damage and/or destruction;

    b.     Diminution in property values;

    c.     Loss of use and enjoyment of property;

    d.     Loss of access to property;

    e.     Substantial economic losses resulting from the physical damages to real and personal property;

      f.      Non-economic damages, including annoyance, discomfort, and inconvenience resulting from the dam failure;

      g.      Other damages to be determined through discovery.

309.    Plaintiffs hereby demand monetary damages, and all damages allowable under law, including damages resulting from annoyance, discomfort, and inconvenience, other non-economic damages, punitive damages, and attorneys fees and costs.

310.    Plaintiffs demand injunctive relief to return Plaintiffs and the Class to the status quo, as the Court may deem equitable under the circumstances, including but not limited to, constructing, reconstructing, and/or repairing the Edenville Dam and the other dams impounding the Four Lakes to meet federal standards for withstanding the Probable Maximum Flood into the future, and remediation efforts on and around the dams to protect against future private property damage caused by flooding and dam failure.

311.    Plaintiffs' claims are not barred by governmental immunity.

## COUNT IV

**42 U.S.C. § 1983 – Fourteenth Amendment, Substantive Due Process, Deprivation of Property**

**(Against all *County Defendants* and all *State Defendants* named in their individual capacities, Dana Nessel, AG Does 1–10, EGLE Does 2–20, and MDNR Does 21–30)**

312.    Plaintiffs restate all allegations in the complaint as if fully stated herein.

313.    At all times relevant hereto, Defendants acted under color of state law to deprive Plaintiffs and the Class of property interests protected by the Constitution of the United States of America.

314.    Plaintiffs and the Class maintained constitutionally-recognized property interests in the real and personal property they rightfully owned or leased at the time their property was invaded by floodwaters caused by the failure of the Edenville Dam.

315.    Plaintiffs and the Class maintained constitutionally-recognized property interests in the rights to exclusive possession and use and enjoyment of real property, which they rightfully held at the time their property was invaded by floodwaters caused by the failure of the Edenville Dam.

316.    Separately and independently, MCL 324.30722 confers a constitutionally-recognized property interest to Plaintiffs and the Class, as residents reliant upon the safe operation and maintenance of the dam, which guarantees that the State Defendants will conduct an inspection upon learning about the need for maintenance and repairs of the dam and order that they be conducted if necessary to public health and safety.  The State Defendants failed to satisfy their obligations to Plaintiffs and the Class under MCL 324.30722

317.    The "property" rights asserted herein are clearly established and expressly enumerated in the plain text of the Fourteenth Amendment.

318.    As a result of the Edenville Dam failure, Plaintiffs and the Class were wrongfully deprived of their property, when floodwaters overtook their land causing massive damages that includes, but is not limited to, physical destruction of land and structures, loss of value, personal property destruction and damages, loss of access to property, economic costs associated with remediation and containment, and loss of use and enjoyment of property.

319.    Plaintiffs and the Class were deprived of their property without due process of law.

49

320.    The deprivations of property were caused by wrongful, affirmative government actions that demonstrated a deliberate indifference to whether harm would result to Plaintiffs and the Class.

321.    Defendants each objectively and individually knew of facts from which a substantial risk of harm could be inferred, and Defendants each subjectively and individually did infer such risk of harm, as Defendants each knew of the specific and obvious threats to life, limb, and property posed by a catastrophic Edenville Dam failure that federal regulators long warned was likely given the condition of the dam and its spillways.

322.    Alternatively, Defendants actions causing the deprivations of Plaintiffs' and the Class' property were taken for reasons that were arbitrary, capricious, and/or shock the conscience.

323.    The failure of the Edenville Dam was foreseeable and likely under the circumstances.

324.    Defendants, acting under color of state law, knowingly and intentionally advocated for, and caused, increased water levels on Wixom Lake during the spring rain season.

325.    The County Defendants spent more than a year taking concerted, calculated actions that were intentionally aimed at raising the water levels, despite clear knowledge of the  well-documented deficiencies and inadequacies of the Edenville Dam and its spillways and clear knowledge of the specific harm that would befall Plaintiffs and the Class in the event of a dam failure.

326.    The County Defendants wrongfully abused legitimate governmental powers to intentionally increase water levels on Wixom Lake to dangerous levels, at the great risk and expense of Plaintiffs and the Class.

327.    Despite clear forewarning by federal regulators of dire risks to life, limb, and property, the State Defendants joined the County Defendants in their efforts to obtain an enforceable Rule 307 Order, despite knowledge of the need for maintenance and repair at the dam and failing to conduct any independent investigation into whether such proposed water levels were safe.

328.    During the Part 307 proceeding, State and County Defendants wrongly obscured and omitted the well-known public health and safety reasons why Boyce Hydro's permit was revoked in the first place—the grossly inadequate and defective condition of the Edenville Dam and its spillways.

329.    Then, both State and County Defendants used the Rule 307 order to guarantee increased water levels on Wixom Lake for the summer of 2020, while willfully disregarding the interests of public health and safety.

330.    The State Defendants violated Part 307 and abused their office by receiving a report of the dangerous condition of the Edenville Dam, its need for maintenance and repair, its inability to meet established state safety standards, and the risk the dam posed to life, limb, and property, yet failing to conduct a required safety inspection and failing to order the Counties to lower the water levels and conduct the necessary repairs.

331.    The State Defendants further abused their legitimate authority by initiating litigation against the operator seeking millions of dollars in damages—which were needed to conduct repairs—to restore the State's losses resulting from alleged decreases in the mussel population.

332.    Whether the freshwater mussel population was genuinely placed ahead of human life and property, or whether it was merely used as a legal pretense under which the State could

51

effectuate increased water levels on Wixom Lake, such conduct by the State Defendants demonstrates a callous disregard for the life, safety, and property.

333.    To the extent that Defendants argue that they intentionally raised the water levels on Wixom Lake to dangerous levels pursuant to a legitimate governmental interest, Defendants' purpose was wholly indifferent, arbitrary, shocking, and unconscionable weighed against the catastrophic harm Defendants knew would result in the event of a dam failure.

334.    For example, seeking to protect the lives of freshwater mussels at the great, known danger of local human residents who Defendants knew would be devastated by a massive flood across three counties is a wholly indifferent, arbitrary, and indefensible public justification.

335.    As further example, seeking to save summer on Wixom Lake so that recreational boating can be restored (during a global pandemic nonetheless) is a wholly indifferent, arbitrary, and indefensible governmental interest in light of the countervailing risks posed to the public by a defective and inadequate dam.

336.    Because of Defendants deliberately indifferent, arbitrary, capricious, and conscious-shocking conduct in intentionally causing the water on Wixom Lake to be increased to dangerous levels abutting a dam Defendants knew was unsafe, Plaintiffs and the Class have been deprived of their property without due process of law.

337.    As a direct and proximate result of Defendants' conduct, Plaintiffs and the Class have suffered extensive damages, past, present, and future, including but not limited to:

      a.    Extensive physical property damage and/or destruction;

      b.    Diminution in property values;

      c.    Loss of use and enjoyment of property;

      d.    Loss of access to property;

e.      Substantial economic losses resulting from the physical damages to real and
personal property;

f.      Non-economic    damages,    including    annoyance,    discomfort,    and
inconvenience resulting from the dam failure;

g.      Other damages to be determined through discovery.

338.    Plaintiffs hereby demand monetary damages, equitable relief, and all other damages
allowable under law, including damages resulting from annoyance, discomfort, and
inconvenience, non-economic damages, punitive damages, prevailing party costs and fees.

339.    Plaintiffs demand injunctive relief to return Plaintiffs and the Class to the status
quo, as the Court may deem equitable under the circumstances, including but not limited to,
constructing, reconstructing, and/or repairing the Edenville Dam and the other dams impounding
the Four Lakes to meet federal standards for withstanding the Probable Maximum Flood into the
future, and remediation efforts on and around the dams to protect against future private property
damage caused by flooding and dam failure.

## COUNT V

**42 U.S.C. § 1983 – Fourteenth Amendment, Substantive Due Process, Deprivation of
Property**

(***Seeking injunctive relief*** only against ***State Defendants*** named in their official capacities,
Dana Nessel, EGLE, MDNR)

340.    Plaintiffs restate all allegations in the complaint as if fully stated herein.

341.    At all times relevant hereto, Defendants acted under color of state law to deprive
Plaintiffs and the Class of property interests protected by the Constitution of the United States of
America.

342.    Plaintiffs and the Class maintained constitutionally-recognized property interests in the real and personal property they rightfully owned or leased at the time their property was invaded by floodwaters caused by the failure of the Edenville Dam.

343.    Plaintiffs and the Class maintained constitutionally-recognized property interests in the rights to exclusive possession and use and enjoyment of real property, which they rightfully held at the time their property was invaded by floodwaters caused by the failure of the Edenville Dam.

344.    Separately and independently, MCL 324.30722 confers a constitutionally-recognized property interest to Plaintiffs and the Class, as residents reliant upon the safe operation and maintenance of the dam, which guarantees that the State Defendants will conduct an inspection upon learning about the need for maintenance and repairs of the dam and order that they be conducted if necessary to public health and safety.  The State Defendants failed to satisfy their obligations to Plaintiffs and the Class under MCL 324.30722.

345.    The "property" rights asserted herein are clearly established and expressly enumerated in the plain text of the Fourteenth Amendment.

346.    As a result of the Edenville Dam failure, Plaintiffs and the Class were wrongfully deprived of their property by governmental action by state actors, when floodwaters overtook their land causing massive damages that includes, but is not limited to, physical destruction of land and structures, loss of value, personal property destruction and damages, loss of access to property, economic costs associated with remediation and containment, and loss of use and enjoyment of property.

347.    The massive flooding event precipitated by the failure of the Edenville Dam has upset life and property across several counties, leading to substantial damages and interferences that will take many years to restore Plaintiffs and the Class to the status quo.

348.    Plaintiffs and the Class were deprived of their property without due process of law.

349.    The deprivations of property were caused by wrongful, affirmative government actions that demonstrated a deliberate indifference to whether harm would result to Plaintiffs and the Class.

350.    Defendant State Departments each objectively and individually knew of facts from which a substantial risk of harm could be inferred, and Defendants each subjectively and individually did infer such risk of harm, as Defendants each knew of the specific and obvious threats to life, limb, and property posed by a catastrophic Edenville Dam failure that federal regulators long warned was likely given the condition of the dam and its spillways.

351.    Alternatively, Defendants actions causing the deprivations of Plaintiffs' and the Class' property were taken for reasons that were arbitrary, capricious, and/or shock the conscience.

352.    The failure of the Edenville Dam was foreseeable and likely under the circumstances.

353.    Defendants, acting under color of state law, knowingly and intentionally advocated for, and caused, increased water levels on Wixom Lake to occur during the spring rain season.

354.    Despite clear forewarning by federal regulators of dire risks to life, limb, and property, the State Defendants joined the County Defendants in their efforts to obtain an enforceable Rule 307 Order, despite knowledge of the need for maintenance and repair at the dam and failing to conduct any independent investigation into whether such proposed water levels were safe.

355.    During the Part 307 proceeding, State Defendants wrongly obscured and omitted the well-known public health and safety reasons why Boyce Hydro's permit was revoked in the first place—the grossly inadequate and defective condition of the Edenville Dam and its spillways.

356.    Then, the State Defendants used the Rule 307 order to guarantee increased water levels on Wixom Lake for the summer of 2020, while willfully disregarding the interests of public health and safety.

357.    The State Defendants violated Part 307 and abused their office by receiving a report of the dangerous condition of the Edenville Dam, its need for maintenance and repair, its inability to meet established state safety standards, and the risk the dam posed to life, limb, and property, yet failing to conduct a required safety inspection and failing to order the Counties to lower the water levels and conduct the necessary repairs.

358.    The State Defendants further abused their legitimate authority by initiating litigation against the operator seeking millions of dollars in damages—which were needed to conduct repairs—to restore the State's losses resulting from alleged decreases in the mussel population.

359.    Whether the freshwater mussel population was genuinely placed ahead of human life and property, or whether it was merely used as a legal pretense under which the State could effectuate increased water levels on Wixom Lake, such conduct by the State Defendants demonstrates a callous disregard for the life, safety, and property.

360.    To the extent that Defendants argue that they intentionally raised the water levels on Wixom Lake to dangerous levels pursuant to a legitimate governmental interest, Defendants' purpose was wholly indifferent, arbitrary, shocking, and unconscionable weighed against the catastrophic harm Defendants knew would result in the event of a dam failure.

56

361.     Seeking to protect the lives of freshwater mussels at the great, known danger of local human residents who Defendants knew would be devastated by a massive flood across three counties is a wholly indifferent, arbitrary, and indefensible public justification.

362.     Seeking to save summer on Wixom Lake so that recreational boating can be restored (during a global pandemic nonetheless) is a wholly indifferent, arbitrary, and indefensible governmental interest in light of the countervailing risks posed to the public by a defective and inadequate dam.

363.     Because of Defendants deliberately indifferent, arbitrary, capricious, and conscious-shocking conduct in intentionally causing the water on Wixom Lake to be increased to dangerous levels abutting a dam Defendants knew was unsafe, Plaintiffs and the Class have been deprived of their property without due process of law.

364.     As a direct and proximate result of Defendants' conduct, Plaintiffs and the Class have suffered extensive damages, past, present, and future, including but not limited to:

a.      Extensive physical property damage and/or destruction;

b.      Diminution in property values;

c.      Loss of use and enjoyment of property;

d.      Loss of access to property;

e.      Substantial economic losses resulting from the physical damages to real and personal property;

f.      Non-economic damages, including annoyance, discomfort, and inconvenience resulting from the dam failure;

g.      Other damages to be determined through discovery.

365.    Plaintiffs demand injunctive relief to return Plaintiffs and the Class to the status quo, as the Court may deem equitable under the circumstances, including but not limited to, constructing, reconstructing, and/or repairing the Edenville Dam and the other dams impounding the Four Lakes to meet federal standards for withstanding the Probable Maximum Flood into the future, and remediation efforts on and around the dams to protect against future private property damage caused by flooding and dam failure.

## **RELIEF REQUESTED**

**WHEREFORE**, Plaintiffs request that the Court:

A.    Order certifying one or more classes pursuant to Fed. R. Civ. P. 23 and designating Plaintiffs as the Class Representatives and undersigned counsel as Class Counsel;

B.    Order that all State and County Defendants violated the constitutional rights of Plaintiffs and the Class;

C.    Declare Defendants liable for each cause of action as stated above;

D.    Order compensatory damages for the injuries suffered by Plaintiffs and the Class, in an amount fair, just, and reasonable, but well in excess of $5,000,000, for damages including but not limited to:

    i.    Extensive physical property damage and/or destruction;

    ii.    Diminution in property values;

    iii.    Loss of use and enjoyment of property;

    iv.    Loss of access to property;

    v.    Substantial economic losses resulting from the physical damages to real and personal property;

      vi.        Non-economic damages, including annoyance, discomfort, and inconvenience resulting from the dam failure;

      vii.      Other damages to be determined through discovery.

E.     Order all Defendants, including State Defendants named in official capacities, liable for injunctive relief to restore Plaintiffs and the Class to the status quo and preventing future, foreseeable harm, including but not limited to financing direct remediation efforts on and around Plaintiffs' property to protect against future property damage caused by flooding and dam failure, and constructing, reconstructing, and/or repairing the Edenville Dam and the other dams impounding the Four Lakes to meet federal standards for withstanding the Probable Maximum Flood into the future.

F.     Order Defendants liable to the Plaintiffs for an award of exemplary, consequential, and/or punitive damages to the extent allowable by law.

G.     Award Plaintiffs all costs and attorney fees which resulted from the initiation and prosecution of this litigation to the extent allowable by law;

H.     Award Plaintiffs such other relief as this Court deems just and equitable under the circumstances.

## **JURY DEMAND**

Plaintiffs hereby demand a trial by jury.

Dated: May 27, 2020                 Respectfully submitted,

                           **LIDDLE & DUBIN, P.C.**

                           By: /s/ _Matthew Z. Robb_

                           STEVEN D. LIDDLE (P45110)
                           DAVID R. DUBIN (P52521)
                           MATTHEW Z. ROBB (P81665)

*Attorneys for Plaintiffs*
975 E. Jefferson Ave.
Detroit, Michigan 48207
(313) 392-0015
SLiddle@LDClassAction.com
DDubin@LDClassAction.com
MRobb@LDClassAction.com